## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

**CAMISHA IRENE CORDOVA,**

**Plaintiff,**

**Civ. No. 21-442 KK**

**v.**

**KILOLO KIJAKAZI, Acting**
**Commissioner of Social Security,**

**Defendant.**

## MEMORANDUM OPINION AND ORDER[1]

THIS MATTER is before the Court on Plaintiff Camisha Irene Cordova's Motion to Reverse and Remand for a Rehearing with Supporting Memorandum, filed November 15, 2021. (Doc. 18.) The Acting Commissioner of the Social Security Administration ("Commissioner") filed a Response in opposition, and Ms. Cordova filed a Reply in support. (Docs. 22, 23.) Having meticulously reviewed the entire record and relevant law, and being otherwise fully advised, the Court finds that Ms. Cordova's Motion is well-taken and should be GRANTED.

### I. BACKGROUND AND PROCEDURAL HISTORY

Ms. Cordova brings this action under 42 U.S.C. §§ 405(g) and 1383(c)(3), seeking reversal of the Commissioner's decision denying her claims for disability insurance benefits ("DIB") and Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401–434 and 1381–1383f. (Doc. 1.) This is the second time that Ms. Cordova has appealed the denial of her claim in federal court.

---

[1] Pursuant to 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73, the parties have consented to the undersigned to conduct dispositive proceedings and order the entry of final judgment in this case. (Doc. 9.)

**A.  Background**

Ms. Cordova, age 50, is a high school graduate with two years of college and lives with her husband and adult daughter. (AR 53, 831.)[2] She previously worked as a server and bartender but has not worked since 2014. (AR 820–21.) Ms. Cordova suffers from degenerative disc disease, bulging discs, chronic pain, radiculopathy, facet arthrosis, depression, anxiety, and Post Traumatic Stress Disorder ("PTSD"). (AR 78, 446, 575, 661, 675, 695, 1375.) On February 12, 2015, Ms. Cordova fell into a manhole injuring her right knee and hip. (AR 398.) On August 25, 2016, "based on multiple complaints of multiple trigger points of pain and also good response to nortriptyline treatment," she was diagnosed with posttraumatic fibromyalgia stemming from her fall. (AR 536–37.)

MRI and X-ray imaging of Ms. Cordova's spine shows disc degeneration and "extensive spinal pathology, facet arthrosis, [and] bulging discs at multiple levels in [cervical spine] and lumbar spine." (AR 391, 437, 472.) Imaging of her cervical spine shows "moderate central canal stenosis" and "moderate to severe foraminal stenosis" on the right side "with likely compression of the C6 nerve roots." (AR 466, 661.) Imaging of her lumber spine shows "mild central canal stenosis and moderately severe right and mild left neural foraminal stenosis" with "exiting nerve impingement." (AR 551, 676.) On January 1, 2017, Ms. Cordova had an Electromyography ("EMG") which found "evidence of right L5-S1 Lumbar radiculopathy with ongoing denervation activity in the lower lumbar paraspinal and primarily chronic findings in the right lower extremity." (AR 752.)

---

[2] Citations to "AR" refer to the Certified Transcript of the Administrative Record filed on September 16, 2021. (Doc. 15.)

On January 9, 2016, Dr. Alissa Greenbaum, MD, performed a consultative physical exam of Ms. Cordova and noted the following objective and clinical findings:

> The claimant demonstrates physical exam findings including paraspinal tenderness in the cervical and lumbar regions, positive straight leg raise on the right eliciting low back pain only, decreased range of motion in bilateral shoulders, tenderness to palpation of right lateral hip, mildly decreased strength of the right upper and lower extremities compared to left.

(AR 439; *see also* AR 471–72 (noting "[p]ain to straight leg raise: positive" on left and right side).) Dr. Greenbaum also recorded decreased range of motion in Ms. Cordova's right and left cervical spine rotations, thoracolumbar spine flexion and extension, and a slightly decreased quality of fist of right hand compared to left. (AR 437–38.)

Ms. Cordova reports experiencing "pain on the right upper extremity involving the whole arm and numbness in all the fingers different from the left," "low back pain and pain radiating down both lower extremities," and "neck pain/numbness/tingling radiating to her face, jaw, [and] shoulders." (AR 562, 659, 675.) She asserts that her pain sometimes reaches 10/10. (*See, e.g.*, AR 641.) Ms. Cordova also testified that she experiences flare ups "one to two times a month" of her fibromyalgia symptoms, and during these flare ups, her pain symptoms are worse, and she will "throw up" or have to be "on the toilet a lot." (AR 824.) Ms. Cordova further testified that she has memory and concentration problems because of the medications she has taken, and suffers from anxiety problems that recently forced her to quit an internship. (AR 826, 828.)

To treat her back and neck issues, Ms. Cordova "has tried epidural steroid injections, opioid medications, Cymbalta, Celexa, nortriptyline, amitriptyline, nonsteroidal anti-inflammatories, chiropractic care, massage therapy, land based [physical therapy], [and] water based [physical therapy]" without significant improvement in her symptoms. (AR 660.) She also received a consultation for back surgery, but she was found to not be a candidate because the

3

"placement of a spinal cord stimulator in the cervical spine could be complicated by a spinal cord injury since she already has a significant central canal stenosis." (AR 662.) However, Ms. Cordova testified that radiofrequency ablation treatment has "helped due to the fact that they essentially just burned away that nerve ending," but she still experiences weakness in her lower back and legs, and she has "continued weakness and growing weakness in the right arm." (AR 822–23; *see also* AR 1382–83.)

### B. Procedural History

Ms. Cordova filed claims for SSI and DIB on August 17, 2015, with an alleged onset date of November 27, 2014. (AR 197.) Ms. Cordova's claims were denied initially and upon reconsideration. (AR 128–32, 135–40.) On August 12, 2016, she requested a hearing before an Administrative Law Judge ("ALJ"), and on January 9, 2018, a hearing was held before ALJ Cole Gerstner. (AR 50–77, 143–44.) On April 2, 2018, the ALJ issued an unfavorable decision. (AR 33–44.) Ms. Cordova appealed the decision to the Appeals Council, and on December 14, 2018, the Appeals Council denied her request for review. (AR 1–4.) On February 14, 2019, Ms. Cordova appealed in federal court, and on February 10, 2020, the District of New Mexico reversed the Commissioner's decision and remanded the case for reconsideration. (AR 870–71, 872–90, 891.). On July 31, 2020, the Appeal Council sent Ms. Cordova's case back to an ALJ in accordance with the Court's order. (AR 892–95.)

On December 7, 2020, in a pre-hearing memorandum, Ms. Cordova requested "that her alleged onset date be amended from November 27, 2014 to February 12, 2015, the date of her fall." (AR 1035 (emphasis omitted).) On December 15, 2020, ALJ Gerstner held a second hearing, and on March 17, 2021, he issued a second unfavorable decision. (AR 785–806, 814–42.) The Appeals Council declined to assume jurisdiction, and the ALJ's decision became the

Commissioner's final decision. *See Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004); 20 C.F.R. § 416.1484. On May 11, 2021, Ms. Cordova appealed the decision to this Court. (Doc. 1.)

### C.  The ALJ's decision

The ALJ applied the Commissioner's five-step evaluation process.[3] At step one, the ALJ determined that Ms. Cordova meets the insured status requirements under the Social Security Act through September 30, 2108, and has "not engaged in substantial gainful activity since November 27, 2014, the alleged onset date or the amended onset date of February 12, 2015." (AR 788 (citations omitted).) At step two, the ALJ found that Ms. Cordova "has the following severe impairments: right hip bursitis, degenerative disc disease, fibromyalgia, right knee patellofemoral joint DJD, obesity, post-traumatic stress disorder (PTSD), somatic disorder, and depression." (*Id.*) At step three, the ALJ found that Ms. Cordova's impairments do not meet or medically equal the severity of one of the Listings described in Appendix 1 of 20 C.F.R. Part 404, Subpart P. (AR 789-791.)

At step four,[4] the ALJ found that Ms. Cordova

---

[3] The five-step sequential evaluation process requires the ALJ to determine whether:

    (1)    the claimant engaged in substantial gainful activity during the alleged period of disability;

    (2)    the claimant has a severe physical or mental impairment (or combination of impairments) that meets the duration requirement;

    (3)    any such impairment meets or equals the severity of a listed impairment described in Appendix 1 of 20 C.F.R. Part 404, Subpart P;

    (4)    the claimant can return to his past relevant work; and, if not,

    (5)    the claimant is able to perform other work in the national economy, considering his residual functional capacity, age, education, and work experience.

20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); *Fischer-Ross v. Barnhart*, 431 F.3d 729, 731 (10th Cir. 2005); *Grogan v. Barnhart*, 399 F.3d 1257, 1261 (10th Cir. 2005). The claimant has the burden of proof in the first four steps of the analysis and the Commissioner has the burden of proof at step five. *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007). A finding that the claimant is disabled or not disabled at any point in the process is conclusive and terminates the analysis. *Casias v. Sec'y of Health & Human Servs.*, 933 F.2d 799, 801 (10th Cir. 1991).

[4] Step four involves three phases. *Winfrey v. Chater*, 92 F.3d 1017, 1023 (10th Cir. 1996). First, the ALJ must

has the residual functional capacity [("RFC")] to perform light work . . . except lifting 20 pounds occasionally and 10 pounds frequently. She can carry 20 pounds occasionally and 10 pounds frequently. She can sit for 6 hours, stand for 6 hours, and walk for 6 hours. She can push/pull as much as she can lift/carry. She can engage in frequently reaching overhead to the left and frequently reaching overhead to the right. She can handle items frequently with the left hand and can handle items frequently with the right hand. She can frequently finger with the left hand and the right hand. The claimant can climb ramps and stairs occasionally but can never climb ladders, ropes, or scaffolds. She can balance occasionally, stoop occasionally, kneel occasionally, and crouch occasionally but can never crawl. The claimant can occasionally work at unprotected heights occasionally and around moving mechanical parts. She is able to perform simple, routine tasks. She is able to perform simple work- related decisions. She is able to interact with supervisors and coworkers occasionally but can never interact with the public. She can concentrate and persist for 2-hour blocks with normal breaks. She cannot perform tandem work. She is able to make simple work-related decisions and can have occasional changes in work setting.

(AR 791.) The ALJ determined that Ms. Cordova has no past relevant work. (AR 805.)

At step five, the ALJ found that "[c]onsidering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform" (*Id.*) In making this determination, the ALJ relied on the Vocational Expert's testimony that a hypothetical individual with Ms. Cordova's age, education, work experience, and assigned RFC would be able to perform the representative occupations of marker (DOT# 209.587-034), router (DOT# 222.587-038), and cleaner (DOT# 323.687-014), which are each categorized as light in exertional demand and unskilled. (*Id.*) The ALJ concluded that Ms. Cordova "has not been under a disability, as defined in the Social Security Act, from November 27, 2014, through the date of this decision[.]" (AR 806.)

---

consider all of the relevant evidence and determine what is "the most [the claimant] can still do despite [his physical and mental] limitations." 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1). This is the claimant's residual functional capacity. *Id.* Second, the ALJ must determine the physical and mental demands of the claimant's past work. *Winfrey*, 92 F.3d at 1023. Third, the ALJ must determine whether the claimant is capable of meeting those demands given his residual functional capacity. *Id.* A claimant who can perform his past relevant work is not disabled. 20 C.F.R. §§ 404.1520(f), 416.920(f).

## II. STANDARD OF REVIEW

The Court's review of the Commissioner's final decision is limited to determining whether substantial evidence supports the ALJ's factual findings and whether the ALJ applied the correct legal standards to evaluate the evidence. 42 U.S.C. §§ 405(g); 1383(c)(3); *Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004). In making these determinations, the Court must meticulously examine the entire record but may neither reweigh the evidence nor substitute its judgment for that of the agency. *Flaherty v. Astrue*, 515 F.3d 1067, 1070 (10th Cir. 2007). In other words, the Court does not reexamine the issues *de novo*. *Sisco v. U.S. Dep't of Health & Human Servs.*, 10 F.3d 739, 741 (10th Cir. 1993).

The Court will not disturb the Commissioner's final decision if it correctly applies legal standards and is based on substantial evidence in the record. "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Langley v. Barnhart*, 373 F.3d 1116, 1118 (10th Cir. 2004) (citations and quotations omitted). It is "more than a scintilla, but less than a preponderance." *Lax*, 489 F.3d at 1084. "A decision is not based on substantial evidence if it is overwhelmed by other evidence in the record[,]" *Langley,* 373 F.3d at 1118 (citations and quotations omitted), or "constitutes mere conclusion." *Musgrave v. Sullivan,* 966 F.2d 1371, 1374 (10th Cir. 1992). The Court's examination of the record as a whole must include "anything that may undercut or detract from the ALJ's findings in order to determine if the substantiality test has been met." *Grogan v. Barnhart*, 399 F.3d 1257, 1262 (10th Cir. 2005).

"The failure to apply the correct legal standard or to provide this court with a sufficient basis to determine that appropriate legal principles have been followed is grounds for reversal." *Jensen v. Barnhart*, 436 F.3d 1163, 1165 (10th Cir. 2005) (citations, quotations, and alterations

omitted). Although an ALJ is not required to discuss every piece of evidence, "[t]he record must demonstrate that the ALJ considered all of the evidence," and "in addition to discussing the evidence supporting his [or her] decision, the ALJ also must discuss the uncontroverted evidence he [or she] chooses not to rely upon, as well as significantly probative evidence he [or she] rejects." *Clifton v. Chater*, 79 F.3d 1007, 1009–10 (10th Cir. 1996). If the ALJ fails to do so, "the case must be remanded for the ALJ to set out his [or her] specific findings and his [or her] reasons for accepting or rejecting evidence[.]" *Id.* at 1010.

## III. DISCUSSION

Ms. Cordova argues that that the ALJ: 1) failed to properly consider the medical opinion of consultative examiner Dr. Robert Krueger, Ph.D.; and, 2) failed to properly consider the opinion of treating Certified Physician Assistant Andrea Bliss, PA-C.[5] (Doc. 18 at 9–21.) For the reasons discussed below, the Court finds these arguments well taken.

### A.  Legal Standard

"[W]hen assessing a plaintiff's RFC, an ALJ must explain what weight is assigned to each [medical source] opinion and why." *Silva v. Colvin*, 203 F. Supp. 3d 1153, 1157 (D.N.M. 2016). And "[i]f the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted." SSR 96-8P, 1996 WL 374184, at *7 (July 2, 1996). Medical source opinions must be weighed using the factors set forth in 20 C.F.R. § 416.927(c),[6] which are: (1) examining relationship, (2) treatment relationship, (3)

---

[5] Ms. Cordova has conceded her argument that the ALJ lacked the authority to adjudicate his claim under *Seila Law LLC v. Consumer Financial Protection Bureau*, — U.S. —, 140 S. Ct. 2183 (2020). (*See* Doc. 23 at 1.) Ms. Cordova also contends that the ALJ made other errors warranting reversal. (Doc. 18 at 21–25.) The Court will not address these claimed errors because they may be affected on remand. *See Wilson v. Barnhart*, 350 F.3d 1297, 1299 (10th Cir. 2003).

[6] The SSA uses a revised framework for the evaluation of medical source opinions in claims filed on or after March 27, 2017. *See* "Revisions to Rules Regarding the Evaluation of Medical Evidence," 82 Fed. Reg. 5844-01, 2017 WL

supportability, (4) consistency, (5) specialization, and (6) other factors. But "not every factor for weighing opinion evidence will apply in every case," SSR 06-03P, 2006 WL 2329939, at *5, and the ALJ is not required to "apply expressly each of the six relevant factors in deciding what weight to give a medical opinion," *Oldham v. Astrue*, 509 F.3d 1254, 1258 (10th Cir. 2007).

An ALJ is only required to provide good reasons for the weight she gives an opinion and an explanation that makes clear the weight given to the opinion and the reasons for that weight. *See id*.; *see also Givens v. Astrue*, 251 F. App'x 561, 568 (10th Cir. 2007) (ALJ must provide "adequate reasons" for rejecting significantly probative medical evidence concerning claimant's RFC); *Watkins v. Barnhart*, 350 F.3d 1297, 1300 (10th Cir. 2003) (ALJ's decision must be sufficiently specific to make clear to subsequent reviewers the weight the adjudicator gave to medical opinions and the reasons for that weight). But an ALJ's failure to provide adequate reasons why a medical opinion was rejected or assigned a particular weight, or to demonstrate that he has applied the correct legal standards in evaluating the evidence, constitutes reversible error. *See Reyes*, 845 F.2d at 244.

### B.  The ALJ improperly rejected the medical opinion of Dr. Krueger

On June 17, 2018, Dr. Robert Krueger, Ph.D., conducted a consultative psychological examination on Ms. Cordova. (AR 1066–72.) Dr. Krueger performed a clinical interview with biopsychosocial history and a mental status examination, and administered the Beck Depression Inventory ("BDI"), Name Three Objects Test, Working Memory Index Portion from Wechsler Adult Intelligence Scale, Fourth Edition ("WAIS-IV"), and Processing Speed Index Portion from WAIS-IV. (AR 1066.) Dr. Krueger diagnosed Ms. Cordova with chronic PTSD, major

---

168819 (Jan. 18, 2017); 20 C.F.R. §§ 416.927, 416.920c. Because Ms. Cordova filed her claims in 2015, the prior evidentiary framework applies here.

depressive disorder with moderate severity, and "Somatic Symptom Disorder, with predominant pain, persistent, which claimant rates as moderate to severe (chronic pain disorder)." (AR 1070–71.)

Regarding the mental status exam, Dr. Krueger found that Ms. Cordova was "oriented and was cooperative," but "presented as being somewhat anxious." (AR 1069.) Dr. Krueger found no evidence of hypomania or mania, no evidence of a bipolar disorder, and no evidence of hallucinations, delusional thinking, or psychosis. (*Id.*) Dr. Krueger recorded that Ms. Cordova's speech "generally was clear and was of average rate," but she "reported having issues with concentration and memory." (*Id.*) Dr. Krueger also noted that Ms. Cordova reported "having been subjected to several traumas in her life and described ongoing anxiety symptoms that are consistent with post-traumatic stress disorder" and "having ongoing issues with depression." (*Id.*)

Ms. Cordova obtained a score of 56 on the BDI test, which was "a highly elevated score that suggests serious difficulties with depression now." (AR 1070.) On the Name Three Objects Test, "she was quite accurate with short-term memory skills," but incorrectly identified "pine tree" as "peach tree." (*Id.*) On the Working Memory Index portion of the WAIS-IV, Ms. Cordova fell within the 37th percentile which showed that "[s]he is functioning within the average range in terms of her working memory skills." (*Id.*) And on the Processing Speed Index portion of the WAIS-IV, Ms. Cordova fell within the 5th percentile which was "evidence of having serious impairment with visual motor processing speed." (*Id.*)

Dr. Krueger completed a "Medical Assessment of Ability to do Work-related Activities (Mental)" form based on Ms. Cordova's "medical history and the chronicity of findings as from 2015 to current examination." (AR 1076 (emphasis omitted).) Dr. Krueger opined that Ms.

Cordova has marked limitations in her ability to: 1) understand, remember, and carry out detailed instructions; 2) maintain attention and concentration for 2-hour segments; 3) Perform activities within a schedule, maintain regular attendance and be punctual within customary tolerance; 4) sustain an ordinary routine without special supervision; 5) Complete a normal workday and workweek without interruptions from psychological based symptoms and to perform at a consistent pace without unreasonable number and length of rest periods; 6) interact appropriately with the general public; 7) respond appropriately to changes in the work place; and, 8) travel in unfamiliar places or use public transportation. (AR 1076–77.)

Dr. Krueger also opined that Ms. Cordova has moderate limitations in her ability to: 1) remember locations and work-like procedures; 2) carry out very short and simple instructions; 3) work in coordination with/or proximity to others without being distracted by them; 4) accept instructions and respond appropriately to criticism from supervisors; 5) get along with coworkers or peers without distracting them or exhibiting behavioral extremes; 6) maintain socially appropriate behavior and adhere to bask standards of neatness and cleanliness; 7) be aware of normal hazards and take adequate precautions; and 8) set realistic goals or make plans independently of others. (*Id.*) Dr. Krueger explained that his opinions were based on his findings that Ms. Cordova "has issues with chronic pain and limited mobility, claimant has issues since at least 2015 with anxiety, PTSD, depression, and has seriously impaired visual-motor working speed." (AR 1076.)

The ALJ gave "little weight" to the opinion of Dr. Krueger, explaining that

[t]he extreme number of symptoms and limitations reported here have no support in Dr. Krueger's notes, which do not reflect these limitations. Dr. Krueger's notes are mostly benign, indicating that the claimant had normal short-term memory skills. Additionally, Dr. Krueger is not a treating physician for the claimant. Dr. Krueger apparently relied quite heavily on the subjective report of symptoms and limitations provided by the claimant, and seemed to uncritically accept as true

most, if not all, of what the claimant reported. Furthermore, his opinions are wholly inconsistent with the treatment notes, which indicate that the claimant routinely had a normal mental status exam. Therefore, this opinion is given little weight.

(AR 801–02.) As the Court explains, the ALJ's stated justifications are inadequate and constitute reversible error.

The ALJ's assertion that Dr. Krueger's notes were mostly benign and did not support the "extreme number" of limitations to which he opined inaccurately describes the relevant portions of the record. (AR 801.) In fact, Dr. Krueger's notes were not "benign" and his evaluation included objective testing, the results of which support his opinions. Ms. Cordova's score on the BDI indicated that she has "serious difficulties with depression," and her score on the Processing Speed Index portion of the WAIS-IV showed that she had "serious impairment" in her ability to process and respond to information. (AR 1070.) Additionally, Dr. Krueger discussed with Ms. Cordova her specific past traumas, and that she was "having issues with hypervigilance" and "avoidant behavior." (AR 1068.) Based on testing results and the clinical interview, Dr. Krueger diagnosed Ms. Cordova with PTSD, Major Depressive Disorder, and Somatic Symptom Disorder, with predominate and persistent pain.[7] (AR 1070–71.) Dr. Krueger explained that these findings supported his opinions as to Ms. Cordova's limitations. (*See* AR 1076.)

The ALJ is not required to discuss every piece of evidence but is required to "discuss the uncontroverted evidence he chooses not to rely upon, as well as significantly probative evidence he rejects." *Clifton*, 79 F.3d at 1010. He may also not "pick and choose through an uncontradicted medical opinion, taking only the parts that are favorable to a finding of

---

[7] With Somatic Symptom Disorder, "[t]he pain and other problems are real. They may be caused by a medical problem. Often, no physical cause can be found. However, it is the extreme reaction and behaviors about the symptoms that are the main problem." https://medlineplus.gov/ency/article/000955.htm (last visited Sept. 19, 2022).

nondisability." *Haga v. Astrue*, 482 F.3d 1205, 1208 (10th Cir. 2007). The ALJ failed to correctly apply these legal standards here. Instead, the ALJ selectively noted that Dr. Krueger found that Ms. Cordova "had normal short-term memory skills," (AR 801), but failed to acknowledge and discuss the objective testing supporting Dr. Krueger's diagnoses and findings of limitations. As such, the ALJ's opinion leaves the Court unable to determine whether he properly rejected the significantly probative evidence supporting Dr. Krueger's medical opinion.

The ALJ's assertion that Dr. Krueger "relied quite heavily" on the subjective reporting of Ms. Cordova, "and seemed to uncritically accept as true most, if not all, of what the claimant reported," (AR 801–02) is likewise inadequate because it ignores that Dr. Krueger administered tests, performed a mental status exam, and observed Ms. Cordova's signs and symptoms prior to diagnosing Ms. Cordova and forming his medical opinion. (*See* AR 1069–70.) This is similar to *Victory v. Barnhart*, where the ALJ rejected a medical opinion after concluding that the physician had "relied quite heavily upon claimant's subjective complaints." *Victory v. Barnhart*, 121 F. App'x 819, 823 (10th Cir. 2005). The Tenth Circuit determined that the ALJ's rejection "impermissibly rest[ed] on [the ALJ's] speculative, unsupported assumption" because ALJ's finding had "ignore[d] all of [the doctor's] examinations, medical tests, and reports." *Id.*; *see also Ellvinger v. Saul*, No. 19-cv-385, 2020 WL 6286359, at *6 (D.N.M. Oct. 27, 2020) (collecting cases and noting that "[o]ther decisions of this Court, addressing similar circumstances" have followed *Victory's* reasoning and conclusion). Here too, the ALJ erred in failing to consider Dr. Kreuger's reliance on test results and clinical observations.

Additionally, as the Tenth Circuit has explained "[t]he practice of psychology is necessarily dependent, at least in part, on a patient's subjective statements." *Thomas v. Barnhart*, 147 F. App'x 755, 759 (10th Cir. 2005). As such, it is improper for an ALJ to reject a

psychologist's opinion "solely for the reason that it was based on [the claimant's] responses because such rejection impermissibly substitutes [the ALJ's] judgment for that of [the doctor]." *Id.* at 760; *see also Langley v. Barnhart*, 373 F.3d 1116, 1121 (10th Cir. 2004) (noting that an ALJ may not reject a treating physician's opinion based on mere "speculative conclusion that the report was based only on claimant's subjective complaints"). Furthermore, Dr. Krueger, as a psychologist, is trained to evaluate subjective responses for diagnoses and treatment. In concluding that Dr. Kreuger "seemed to uncritically accept as true most, if not all, of what the claimant reported," (AR 802), the ALJ improperly substituted his lay opinion for that of Dr. Krueger. *See Lax*, 489 F.3d at 1089 ("[A]n ALJ cannot substitute her lay opinion for that of a medical professional."); *see also Kemp v. Bowen*, 816 F.2d 1469, 1476 (10th Cir. 1987) ("While the ALJ is authorized to make a final decision concerning disability, he cannot interpose his own 'medical expertise' over that of a physician. . ."). Dr. Krueger's purported reliance on Ms. Cordova's subjective reports is inadequate justification for the ALJ's rejection of Dr. Krueger's medical opinions.

The ALJ's assertion that Ms. Cordova's treatment notes showed that she "routinely had a normal mental status exam," (AR 802), is also legally inadequate here. Mental status exams "document a clinician's observations of the patient *at a particular point in time*," and "while it is entirely proper for an ALJ to consider [mental status exam] findings when evaluating the supportability of a medical opinion concerning a claimant's overall mental functioning and limitations, such findings are not necessarily dispositive to this analysis." *Casas v. Saul*, No. 19-cv-1154, 2021 WL 107244, at *5 (D.N.M. Jan. 12, 2021) (emphasis in original) (citations and quotations omitted). A mental status exam "is the psychiatrist's version of the physical examination" and considers the "broad categories of appearance, behavior, motor activity,

speech, mood, affect, thought process, thought content, perceptual disturbances, cognition, insight, and judgment."[8] Rachel M. Voss & Joe M Das, *Mental Status Examination* (Sept 16, 2021),https://www.ncbi.nlm.nih.gov/books/NBK546682/ (last visited Sept. 19, 2022). However, "[t]he mental status examination is a subjective assessment of a patient and may vary significantly between practitioners depending on their level of skill in observation and eliciting responses from the patient." *Id.*

The record contains two comprehensive mental status exams: the exam performed by Dr. Krueger during Ms. Cordova's consultative psychological exam, and the exam performed by Dr. Greenbaum during Ms. Cordova's consultative physical exam.[9] (AR 436, 1069.) Dr. Greenbaum recorded that

> [t]he claimant was alert and oriented to person, place, and year and was able to comprehend normal conversational speech without difficulty. The claimant's speech was fluent and comprehendible. Their affect was normal during the interview. The claimant's thought process was linear and logical and a good fund of knowledge was evident. The claimant was able to recall 3 out of three words at five minutes. They were able to spell the word WORLD backwards.

(AR 436.) However, Dr. Greenbaum is not a psychologist and outside of the mental status exam, Dr. Greenbaum did not discuss, analyze, or consider Ms. Cordova's mental impairments or non-physical limitations. The ALJ noted the normal results recorded in Dr. Greenbaum's mental status exam, (*see, e.g.*, AR 790), but the ALJ did not explain why Dr. Greenbaum's mental status

---

[8] The "most widely used 'short, portable' mental status test" is the Mini Mental Status Exam. David C. Martin, *The Mental Status Examination*, *in* Clinical Methods: The History, Physical, and Laboratory Examinations (HK Walker et al. eds., 3rd ed. 1990), https://www.ncbi.nlm.nih.gov/books/NBK320/ (last visited Sept. 19, 2022). However, "a cursory examination will yield cursory data;" the user should "realize[] the limitations of a screening test" and "not overinterpret results." *Id.*

[9] Dr. Greenbaum performed an internal medicine/family practice consultative exam but was asked to "[p]lease comment on mental status." (AR 433.)

exam findings should be given more weight than the findings of Dr. Krueger, who is a licensed and board-certified psychologist and performed a psychological examination. (AR 1082–83.)

The ALJ also explained that treatment notes of Dr. Krishna Chari, Psy.D., "indicate[d] that the claimant routinely had a normal mental status exam." (AR 802.) Dr. Chari is Ms. Cordova's treating psychologist and is a member of Ms. Cordova's care team at the University of New Mexico ("UNM") Pain Management Clinic. (AR 662.) Ms. Cordova was initially put in contact with Dr. Chari "to address [Ms. Cordova's] frustration and her strategies for directing her physical activity as she recovers from [her neck and back injuries]," and Dr. Chari provides psychotherapy treatment "for symptoms of anxiety and depression and historical instances psychological trauma." (AR 662, 1318.) The record contains treatment notes from 33 sessions with Dr. Chari, and each treatment note contains that boilerplate language that "Ms. Cordova presents with no suicidal Ideation, no homicidal ideation and no acute psychosis. Mental status was normal." (AR 684, 691–94, 697, 699–701, 1317, 1319, 1322–31, 1336, 1339–40, 1350–51, 1355, 1358, 1364–65, 1369, 1376.)

However, Dr. Chari's notes do not indicate that he performed a comprehensive mental status exam at each session. Indeed, there is no information recorded indicating Ms. Cordova's orientation, mood, affect, thought process, or concentration. But Dr. Chari's treatment notes discuss Ms. Cordova dealing with "anxiety," feeling "overwhelmed," having "increased symptoms of depression," and feeling "emotionless," (AR 692, 1317, 1358), which is consistent with Dr. Kreuger's report and opinion. Moreover, Dr. Chari provided a treating source opinion in which he opined that Ms. Cordova has marked limitations in her ability to "maintain[] social functioning," "maintain[] concentration, persistence, or pace," and has a "[m]arked restriction of

activities of daily living."[10] (AR 774–75.)  Dr. Krueger opined to these same limitations. (AR 1078–80.) The ALJ was required to discuss any "significantly probative evidence he rejects" and may not cherry-pick from the medical records. *Clifton*, 79 F.3d at 1010; *Haga*, 482 F.3d at 1208. Here, the ALJ only considered one portion of Dr. Chari's treatment notes—which was copy/pasted for each visit—and did not discuss the records from Dr. Chari which were consistent with Dr. Krueger's medical opinion.

Finally, the ALJ noted that Dr. Krueger is a consultative examiner and not Ms. Cordova's treating physician. "Treatment relationship" is a factor under 20 C.F.R. § 416.927(c), and an ALJ may consider the relationship between the provider and claimant when determining the weight to be given to an opinion and whether to give the opinion controlling weight. However, the Tenth Circuit has explained that treatment relationship "is not by itself a basis for rejecting [a medical opinion]—otherwise the opinions of consultative examiners would essentially be worthless, when in fact they are often fully relied on as the dispositive basis for RFC findings." *Chapo v. Astrue*, 682 F.3d 1285, 1291 (10th Cir. 2012). Because Dr. Krueger's status as a consultative examiner cannot be used as the sole justification for rejecting his medical opinion, and given the ALJ's other inadequate explanations highlighted above, this reason also fails.

---

[10] Ms. Cordova did not assert that the ALJ improperly evaluated the treating medical source opinion of Dr. Chari, and, therefore, the Court need not consider whether the ALJ properly considered Dr. Chari's opinion. However, "in the hope of forestalling the repetition of avoidable error" on remand, *Chapo v. Astrue*, 682 F.3d 1285, 1292 (10th Cir. 2012), the Court will briefly discuss the ALJ's rejection of Dr. Chari's treating medical source opinion. The ALJ's rejection of Dr. Chari's medical opinion primarily relied on the assertion that "Dr. Chari's notes are routinely benign and the only treatment she recommended was continued therapy." (AR 802.) But Dr. Chari was a member of Ms. Cordova's pain management care team whose role was to provide therapy, exercises, and techniques to help Ms. Cordova manage her symptoms of depression, anxiety, and PTSD. (*See, e.g.*, AR 697 ("Ms. Cordova and I continued to focus on cognitive behavioral strategies to combat feelings of depression and self-isolation."); AR 692 ("We discussed . . . cognitive behavioral therapy techniques to help manage this anxiety"); AR 1326 ("Discuss and focus on ways to process traumatic memories.")). And the record shows that medication to treat her mental health was prescribed by other members of Ms. Cordova's pain management care team. (*See* AR 1362 (prescribing venlafaxine for anxiety).) The ALJ did not provide sufficient explanation as to why he considered Dr. Chari's care in a vacuum, and not as a member of a care team with a prescribed role.

As a final note, the Commissioner argues that the ALJ reasonably weighed the evidence of Dr. Krueger's evaluation report and the record as a whole and that the ALJ's analysis of Dr. Krueger's medical opinion was not unreasonable. (Doc. 22 at 19.) Thus, the Commissioner contends that the ALJ's rejection of Dr. Krueger's opinion is supported under the substantial evidence standard, and that Ms. Cordova is asking the Court to reweigh the evidence. (Doc. 22 at 19–20.) But "[t]he failure to apply the correct legal standard or to provide this court with a sufficient basis to determine that appropriate legal principles have been followed is grounds for reversal." *Jensen*, 436 F.3d at 1165 (brackets and internal quotation marks omitted). And as discussed above, the ALJ failed to apply the correct legal standards to the evidence in the record and failed to provide sufficient discussion such that the Court may adequately review the ALJ's determination.

For all of the reasons discussed, remand is warranted so that the Commissioner may properly consider and adequately address Dr. Kreuger's expert opinion.

### C.  The ALJ improperly rejected the medical opinion of Ms. Bliss

Certified Physicians' Assistant Andrea Bliss, PA-C, treated Ms. Cordova from October 2017 through April 2018, as a member of Ms. Cordova's care team at the UNM Pain Management Clinic. (*See* AR 682–84, 688–90, 1369–71, 1374–76.) On January 4, 2018, Ms. Bliss completed an "Assessment of Ability to Work-Related Activates (Physical)" form and a "Medical Assessment of Ability to Work-Related Activates (Non-Physical)" form. (AR 779–781.) The physical form asked for "an assessment of how physical work activities are affected by the impairn1ent(s), injuries or sicknesses (e.g. pain or fatigue)", and the non-physical form asked for "an assessment of how non-physical work activities are affected by the impairment(s), injuries or sicknesses (e.g. pain or fatigue)." (AR 779, 781.) Each form asked Ms. Bliss to

"consider the patient's medical history and the chronicity of findings as from 2014 to current examination." (*Id.*)

On the physical assessment form, Ms. Bliss opined that Ms. Cordova could: 1) occasionally lift or carry up to 10 lbs., but never lift over 10 lbs.; 2) only sit for 15 minutes at a time; 3) never reach overhead with her right hand, occasionally reach in all other directions and push and pull with her right hand, and frequently finger and handle; and, 4) never operate foot controls with her right foot and occasionally operate foot controls with her left foot. (AR 779–780.) Ms. Bliss explained that her opinions were supported by Ms. Cordova's 2016 MRI "showing severe stenosis," EMG results, physical exams, and her "weak [right] great toe extension." (*Id.*)

On the non-physical assessment form, Ms. Bliss noted that Ms. Cordova "suffers from pain producing impairment, injury or sickness," her pain is "severe," "suffers from sleep disturbances" and "fatigue as a result of his/her impairments," and "has to rest or lie down at regular intervals because of his/her pain and/or fatigue." (AR 781.) Ms. Bliss opined that Ms. Cordova has marked limitations in her ability to: 1) perform activities within a schedule; 2) maintain regular attendance and be punctual within a customary tolerance; 3) maintain physical effort for long periods without a need to decrease activity or pace, or to rest intermittently; and, 4) complete a normal workday and workweek without interruptions from pain or fatigue based symptoms and to perform at a consistent pace without unreasonable number and length of rest periods. (*Id.*) Ms. Bliss also opined that Ms. Cordova had a moderate limitation in her ability to maintain attention and concentration for two-hours at a time. (*Id.*) Ms. Bliss explained that the non-physical assessment was based on a patient interview and noted that she is followed by Dr. Chari. (*Id.*)

The ALJ noted that "Ms. Bliss is not an acceptable medical source who can provide medical opinions as defined by our Regulations," and considered Ms. Bliss an "other source" under 20 C.F.R. §§ 404.1527(f) and 416.927(f). (AR 802.) The ALJ gave "little weight" to Ms. Bliss's opinions, explaining that

> [t]he opinions expressed by Ms. Bliss are quite conclusory, providing very little explanation of the evidence relied on in forming that opinion. Ms. Bliss did not document positive objective clinical or diagnostic findings to support the functional assessment she provided. Furthermore, the opinions are not supported by Ms. Bliss' own treatment notes, which indicate that the claimant routinely had a mostly normal review of systems on examination. Ms. Bliss also routinely only recommended routine and conservative treatment. Furthermore, some of her opinions seem to rest at least in part on an assessment of mental impairments, which are outside her area of expertise. The notes from other examinations indicate that the claimant routinely had a mostly normal review of systems. Therefore, her opinions are given little weight.

(AR 802–03.)

As an initial matter, although Ms. Bliss is not an "acceptable medical source" under the regulations, at Step Four of the ALJ's evaluation, this only means that Ms. Bliss's opinion may not be given controlling weight under the treating source rule. "Only 'acceptable medical sources' can provide evidence to establish the existence of a medically determinable impairment, only they can provide medical opinions, and only they can be considered treating sources." *Frantz v. Astrue*, 509 F.3d 1299, 1301 (10th Cir. 2007) (internal citations omitted). But non-medical source opinions are relevant "to show the severity of a claimant's impairment(s) and how it affects a claimant's ability to work." *Id.* (cleaned up). And Ms. Bliss's opinion must still be considered pursuant to the 20 C.F.R. § 416.927(c) factors. SSR 06-03P, 2006 WL 2329939 at *2–*3 (S.S.A. Aug. 9, 2006).

The ALJ provided five reasons for rejecting Ms. Bliss's opinion: 1) Ms. Bliss did not document objective clinical or diagnostic findings in support of her opinion and did not explain

the evidence relied upon; 2) Ms. Bliss's opinions were not consistent with her treatment notes; 3) Ms. Bliss only recommended routine and conservative treatment for Ms. Cordova; 4) Ms. Bliss's non-physical assessment was an assessment of mental impairments; and, 5) the record shows that Ms. Cordova routinely had a mostly normal review of systems. (AR 802–03.) These justifications are inadequate to support the ALJ's rejection.

First, the ALJ asserted that Ms. Bliss "did not document positive objective clinical or diagnostic findings to support the functional assessment she provided" and provided "very little explanation of the evidence relied on in forming her opinion." (AR 802–03.) But Ms. Bliss did provide objective clinical and diagnostic findings. Ms. Bliss explained that her opinion as to Ms. Cordova's limitations in her ability to lift and carry were supported by Ms. Cordova's 2016 cervical spine MRI which showed severe stenosis. (AR 779; *see also* AR 676.) Ms. Cordova's stenosis in her cervical spine caused "likely compression of the C6 nerve roots" on the right side, (AR 466, 661, 676), which can cause pain and weakness in a patient's arm. *See Cervical Radiculopathy*, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4958381 (last visited Sept. 19, 2022). Thus, she supported her opinion with diagnostic findings.

Similarly, Ms. Bliss explained that Ms. Cordova's EMG provided support for her opinions that Ms. Cordova could only sit 15 minutes at a time and could not operate a control with her right foot. (AR 779–80.) Ms. Cordova's EMG showed lumbar radiculopathy that affected the muscles in Ms. Cordova's lower back and her right leg. (AR 752.) Lumbar radiculopathy is characterized by "pain that radiates down the legs and is often described by patients as electric, burning, or sharp." James A. Berry, et al., *A Review of Lumbar Radiculopathy, Diagnosis, and Treatment* (Oct. 17, 2019),

https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6858271/ (last visited Sept. 19, 2022). Thus, these opinions are also supported by diagnostic findings.

Finally, Ms. Bliss explained that her opinions related to Ms. Cordova's ability to reach, handle, finger, and push/pull with her right hand were supported by Ms. Cordova's physical exams. (AR 779.) Ms. Bliss performed a physical exam on November 30, 2017, in which she noted "tender and taut muscle fibers" in Ms. Cordova's neck and back and that palpitating "causes radiation of pain around the ear toward the forehead." (AR 683; *see also* AR 689.) Ms. Cordova also was given a comprehensive physical exam on July 31, 2017, by a provider in the UNM neurosurgery department. (AR 675.) Her provider recorded "decreased sensation [to light touch] in her 1-3rd fingers bilaterally" and "decreased dexterity in right hand compared to the left." (AR 677.) Ms. Cordova's physical exams provide clinical findings in support of Ms. Bliss's opinion that Ms. Cordova can never reach overhead and occasionally reach, push, and pull with her right hand.

Furthermore, the medical evidence upon which Ms. Bliss relied is clearly relevant to Ms. Cordova's opined upon limitations. Thus, without an explanation as to why further explanation would be required, the ALJ's assertion that Ms. Bliss provided "very little explanation of the evidence relied on in forming that opinion," (AR 802), cannot serve as adequate justification for the rejection of Ms. Bliss's opinion.

Regarding the ALJ's second reason for rejecting Ms. Bliss's opinion, even if Ms. Bliss recorded mostly normal reviews of systems, the ALJ erred in not considering the entirety of her treatment notes from which the ALJ cherry picked these systems review notations. Ms. Bliss treated Ms. Cordova four times between September 2017 and April 2018. (*See* AR 682–84, 688–

90, 1369–71, 1374–76.) At Ms. Cordova's September 30, 2017 appointment, Ms. Bliss noted

Ms. Cordova's

> [c]urrent pain level to neck and low back as 9/10. Patient has pain to upper and lower spine . . . She feels weak in her right hand which is her dominant hand. She has pain to the side of her face radiating into her shoulder and arm. She has numbness and tingling radiating down her right arm into her fingers.

(AR 689.) Ms. Bliss performed a physical exam and found that Ms. Cordova "has tender and taut

muscle fibers to upper trapezius levator scapula and rhomboids." (*Id.*) At Ms. Cordova's

November 30, 2017 appointment, Ms. Bliss recorded that Ms. Cordova has a pain level of 7/10

and "report[s] pain radiating into her right upper arm." (AR 682.) Ms. Bliss performed a physical

exam which showed "[t]ender and taut muscle fibers to bilateral trapezius and right side

sternocleidomastoid, palpating this muscle causes radiation of pain around the ear toward the

forehead." (AR 683.)

> At Ms. Cordova's January 4, 2018 appointment, Ms. Bliss recorded that Ms. Cordova

> does have weakness in her right great toe extensor. . . . Currently does not feel that she is able to sit in one place for more than 15 minutes without getting up and walking around alternating with lying down as well. This is position of most comfort for her. She endorses fatigue, sleep interference and mood alteration associated with her chronic pain.

(AR 1374-76.) At Ms. Cordova's April 9, 2018 appointment, Ms. Bliss recorded that Ms.

Cordova "has chronic neck and low back pain" and had "done well with cervical [epidural

steroid injection] but feels the pain is returning." (AR 1369.) Ms. Bliss performed a physical

exam and found Ms. Cordova's "[r]ight trapezius very tender to palpation with taut muscle

fibers." (AR 1370.)

Ms. Bliss's treatment notes are consistent with her opinions. By only considering the

reviews of systems, the ALJ impermissibly cherry-picked from Ms. Bliss's notes. *See Haga*, 482

F.3d at 1208. The ALJ's reliance on just the review of systems portions of Ms. Bliss's treatment

notes, without providing an explanation for rejecting the other portions of her notes, is not adequate justification for rejecting her opinion.

Then, in asserting that Ms. Bliss "routinely only recommended routine and conservative treatment," (AR 803), as a basis for rejecting her opinion, the ALJ wrongly focused on only the treatment provided by Ms. Bliss and ignored the record evidence on which Ms. Bliss' opinions were based. Ms. Bliss was a member of Ms. Cordova's care team at the UNM Pain Management Clinic, and Ms. Cordova was treated by providers at UNM, who provided different types of treatment. (*See, e.g.*, AR 691, 1387.) And Ms. Bliss was aware of the various treatments that Ms. Cordova was receiving. (*See, e.g.*, AR 1369 (Ms. Bliss noting that Ms. Cordova had received a cervical epidural steroid injection), AR 1374-76 (Ms. Bliss noting that Ms. Cordova's medications are followed by pain physician Dr. Gonzales and that she was trying to wean off oxycodone/APAP, 3 times per day and is also on Lyrica 3 times per day.) The ALJ did not provide sufficient justification for only considering treatment recommendations from Ms. Bliss rather than the totality of care from the UNM care team of which Ms. Bliss was both aware and a participating treatment provider.

More importantly, the ALJ erred in characterizing Ms. Cordova's treatment as conservative. (AR 803; *see also* AR 804 ("[T]he evidence in the record shows that the claimant received only routine and conservative treatment for her pain symptoms.").) Ms. Cordova's care team at UNM treated her with a cervical interlaminar epidural steroid injection and radiofrequency thermocoagulation [("RFTC")] of cervical medial branches. (AR 1381, 1387.) The risks of these procedures included "unintended neural trauma leading to paresthesia, paresis or paralysis" and "stroke or death." (AR 1381, 1388.) And Ms. Cordova's providers explained that these procedures were indicated because Ms. Cordova had "failed conservative treatment,

including medication management and physical therapy and has significant limitation of function related to this painful condition." (AR 1384, 1388.) Thus, the record shows that Ms. Cordova's providers considered these treatments to be above and beyond the conservative treatment that had failed.[11]   As discussed above, the ALJ may not substitute his lay opinion for that of medical professionals. *See Lax*, 489 F.3d at 1089. Ms. Cordova's providers did not consider her treatment to be conservative, and it is improper for the ALJ to second guess their characterization. This justification for rejecting Ms. Bliss's opinion is inadequate.

The ALJ's assertion that Ms. Bliss's opinions were "outside her area of expertise" (AR 803) is also inadequate to support his rejection of them. True, an ALJ may consider the expertise of a medical source when deciding the weight to give to an opinion, *see* 20 C.F.R. § 416.927(c)(2)(ii), but the ALJ did not adequately explain his conclusion that Ms. Bliss had assessed impairments outside of her area of expertise. The non-physical medical assessment form completed by Ms. Bliss is not the same form as the mental medical assessment form completed by Dr. Krueger. (*Compare* AR 781 *with* AR 1076–77.) The forms consider different types of limitations. Whereas the mental assessment form considers the areas of functioning listed in the "paragraph B" criteria and limitations related to mental impairments, the non-physical assessment form considers limitations on "non-physical work activities" caused by pain symptom due to physical impairments. (AR 781, 1076–77.)

The non-physical assessment form asked about limitations in Ms. Cordova's ability to be punctual, keep a schedule, maintain physical effort, and complete a workday or workweek without interruption from pain symptoms. (*Id.*) Ms. Bliss was one of Ms. Cordova's treating

---

[11] The Ninth Circuit has also expressed doubts "that epidural steroid shots to the neck and lower back qualify as 'conservative' medical treatment." *See Garrison v. Colvin*, 759 F.3d 995, 1015 n.20 (9th Cir. 2014).

providers at the UNM Pain Management Clinic and would therefore have the expertise to opine on how Ms. Cordova's pain symptoms may limit the non-physical activities that are necessary for work. On this record, and without further explanation, the ALJ's contention that Ms. Bliss was opining on impairments outside her area of expertise is inadequate justification for rejecting her opinion.

Finally, the ALJ's assertion that "[t]he notes from other examinations indicate that the claimant routinely had a mostly normal review of systems," (AR 803), is not supported by substantial evidence. There are 58 reviews of systems in the record after Ms. Cordova's alleged onset date, and 53 of the 58 include some mention of Ms. Cordova's back pain, neck pain, joint pain, pain in extremities, and/or fibromyalgia. (AR 312, 316, 320, 336, 340, 349, 353, 363, 367, 376, 380, 384, 388, 436, 461, 465, 468, 470, 477, 480, 488, 494, 498, 502, 510, 514, 523, 526, 534, 538, 548, 562, 660, 676, 679, 687, 702, 1315, 1320, 1332, 1337, 1341, 1343, 1348, 1352, 1356, 1359, 1362, 1366, 1372, 1374, 1379, 1465.) Of the five reviews of systems that do not note these pain symptoms, two are abnormal and suggest neurological or nerve issues. (*See* AR 506, 1474.) And of the three remaining, Ms. Cordova's back and neck pain are discussed in the History of Present Illness section. (*See* AR 689, 1345, 1369.)

Because the majority of reviews of systems in the record discuss Ms. Cordova's pain symptoms, there is not sufficient evidence which a reasonable mind could accept as support for the ALJ's conclusion that Ms. Cordova "had a mostly normal review of systems." (AR 803); *see Langley*, 373 F.3d at 1118. The ALJ's contention is not supported by substantial evidence and cannot justify the rejection of Ms. Bliss's opinion.

The Commissioner argues that the ALJ's assessment of Ms. Bliss's opinion "enjoyed substantial support in the record," and that the Court should not reweigh the evidence. (Doc. 22

at 22.) But as discussed above, the ALJ relied on assertions not supported by substantial evidence, improperly cherry-picked from the record, and failed to properly explain his determinations such that the Court can review his findings. As such, remand is warranted. *See Jensen*, 436 F.3d at 1165.

## IV. CONCLUSION

For the reasons stated above, the ALJ failed to properly evaluate the opinions of Dr. Krueger and Ms. Bliss. Because of these errors, the Court cannot determine whether the ALJ applied correct legal standards and whether his findings are supported by substantial evidence. Ms. Cordova's Motion to Reverse and Remand for a Rehearing with Supporting Memorandum (Doc. 18) is GRANTED, and this matter is remanded to the Commissioner for further proceedings consistent with this Memorandum Opinion and Order.

IT IS SO ORDERED.

_____
KIRTAN KHALSA
UNITED STATES MAGISTRATE JUDGE